## JOHN SEEDEN v. GREAT NORTHERN RAILWAY COMPANY AND ANOTHER.[1]

June 18, 1954.

No. 36,159.

[1]Reported in 65 N. W. (2d) 178.

*Arthur A. Sturdevant,* and *John F. Dulebohn,* for appellant.

*Edwin C. Matthias, Anthony Kane, W. P. Westphal,* and *Don E. Engle,* for respondent Great Northern Railway Company.

*Faegre & Benson, Paul J. McGough,* and *John S. Holten,* for respondent Chicago Great Western Railway Company.

NELSON, JUSTICE.

The plaintiff, John Seeden, was employed by the Gopher Ordnance Works at Rosemount, Minnesota. A carload of rolls of paper pulp had been transported by the defendant railroads from Everett, Washington, to Rosemount, Minnesota. Defendant Chicago Great Western Railway Company, the connecting carrier, made final delivery of the car so loaded on the receiving track at the north gate inside the fence of the premises of the Gopher Ordnance Works, the consignee, at Rosemount. From this point a locomotive of the consignee took over on its own tracks and spotted it for unloading. The plaintiff and other employees of the Gopher Ordnance Works undertook the work of unloading the car, which is described as Pennsylvania Railroad boxcar No. 78939. When the plaintiff and other employees of consignee came to the unloading of this car as their second one for the day, plaintiff proceeded to push forward and up on a lever to start the door moving in the direction he faced. His fellow employees were at the same time pulling on the handle at the other end of the door. As the door opened, one of the paper rolls fell out of the car and struck plaintiff, causing serious injury to him.

The rolls of paper pulp weighed about 700 pounds each; the core, which may also be referred to as the flat side of each roll, was 39 inches in diameter; and the distance through the core from one flat side to the other was 29 inches. There were three tiers of paper rolls in each car. The bottom tier consisted of 36 rolls, arranged in three rows of 12 each running the length of the 40-foot car. The rolls in the middle or second tier were set in the troughs of the bottom layer, with 11 rolls in each row. The top or third tier had 12 rolls per row just as the bottom row. All the rolls were placed with their

flat sides parallel to the sides of the car with the exception of the very last roll loaded on each side of the car, which was placed with its flat side down. Because this last roll was placed with its flat side down and because the diameter of the flat side was 10 inches more than the distance from one flat side to the other, this last roll and the roll next to the opposite door on the third tier each extended some five inches over the supporting second tier of rolls. A 1 x 8-inch fir board had been nailed across the supporting uprights inside the door at the level of this last roll. This was done by the shipper in the process of loading. The evidence indicates that this was the regular course followed in loading with the exception that at times one such fir board was nailed across the supporting uprights and at other times two such boards were nailed across in the same manner depending upon the amount of lumber at hand at the time of loading. After the loading was completed there was a space of six inches from the outside of this roll to the fir board and a space of five and five-sixteenths inches from the board to the door. An inspection made after the accident disclosed that the roll which was missing from the load and was then on the platform floor was the last roll loaded which had overhung the second tier, that this roll bore markings, and that the 1 x 8 fir board was down at one end. It was nine feet five inches from the top of the third tier, where the roll had been, to the platform.

This car had been loaded by the Soundview Pulp Company upon its premises at Everett, Washington, by its own employees and under its supervision, and the car doors had been sealed by its employees and under the supervision of the company. The bill of lading named the Soundview Pulp Company as consignor and the Gopher Ordnance Works as consignee. The original bill of lading was sent to the consignee. There was noted on the bill of lading the letters "S. L. & C." meaning "Shipper's Load and Count" a well-understood term in railroad and shippers parlance which may be found in the Federal Bill of Lading Act.

The matter of distribution of railroad cars for shipping purposes was governed at the time by a statute of the state of Washington,

11 Remington's Rev. Stat. of Washington, § 10347.[2] The defendant Great Northern Railway Company had, pursuant to a request of the Soundview Pulp Company, delivered the empty car to its premises. It was thereafter loaded by the employees of the Soundview Pulp Company, and after it had been fully loaded by its employees and under its supervision, the Great Northern switched the car from consignor's loading platform to its railroad yards at Everett, Washington, and then transported it over its rails to St. Paul, Minnesota, where it delivered the car to the other defendant, Chicago Great Western. The latter transported it to the receiving track of the Gopher Ordnance Works. Thereafter the Gopher Ordnance Works took charge and by its own locomotive switched the car on its own tracks some distance to building 101-C, its warehouse, where it was spotted for unloading.

It is undisputed from the testimony that no employee of either defendant was present in a supervisory capacity or otherwise during either the loading or the unloading of the car; that it had been loaded on the premises of the consignor and was unloaded on the premises of the consignee. The seal that had been placed on the car door was the seal of the consignor, placed thereon by it. This constituted a lock on the car door, and it had not been broken in transit but remained intact until broken by an employee of the consignee.

It appears undisputed that neither defendant supervised the loading or unloading of the car or inspected the inside of the car after loading before sealing or at any time during the unloading, and there is no claim that they had a duty so to supervise or inspect. It also appears without dispute that at no time was it apparent from the outside appearance of the car or its doors that anything

---

[2]"Every railroad company shall, upon reasonable notice, furnish to all persons and corporations who may apply therefor and offer property for transportation sufficient and suitable cars for the transportation of such property in carload lots. In case at any particular time a railroad company has not sufficient cars to meet all the requirements for transportation of property in carload lots, all cars available for such purpose shall be distributed among the several applicants therefor, without unjust discrimination between shippers, localities or competitive or non-competitive points."

unusual had happened on the inside to the rolls of paper pulp as originally loaded therein. Whatever condition was found to exist upon the opening of the car door by an employee of the Gopher Ordnance Works was not visible by inspection from the outside.

This accident occurred on April 3, 1945. Plaintiff brought suit on March 27, 1951, against the transporting and connecting carriers as defendants. Plaintiff alleged that the car was negligently loaded and that the defendant railway companies negligently transported the car. At the close of the plaintiff's case, the trial court directed a verdict in favor of both defendants and against the plaintiff. Plaintiff moved the court below to set aside the directed verdict for the defendants and for a new trial. The court denied the motion, and the plaintiff appeals from the order.

The legal questions involved appear to be as follows:

(1) Is it any part of the duty of reasonable inspection of the delivering railroad carriers here, under the existing circumstances as disclosed by the evidence, to break the seals on the car doors, open the same, and inspect the position of the load contained in a sealed boxcar which has been shipped under "Shipper's Load and Count" bill of lading unless it is apparent from outside inspection that something has occurred in transit to disorganize or damage the contents within?

(2) If an employee of a consignee which assumes the entire burden and supervision of unloading is injured while unloading a boxcar loaded and sealed by the shipper and consignor and finally switched and spotted for unloading by the consignee into and over its enclosed area as was done here, the injury resulting from the fall of a part of the load which was not securely fastened down or in place, does the doctrine of *res ipsa loquitur* apply against the transporting carriers, the car having been transported under the shipper's seal and "Shipper's Load and Count" bill of lading?

We construe plaintiff's argument on appeal as falling into two parts, dealing first with the negligent loading of the car and next with the application of the doctrine of *res ipsa loquitur*.

Plaintiff in his brief argues that the negligence lies in the violent, rough handling of the car in transport by defendant carriers, which caused the pulp roll in question to shift in the top tier, thus forcing down the dunnage board which shipper had nailed across between the door and the roll, as was its customary practice in loading and shipping the material in question, and that such negligence on the part of the defendant carriers caused the roll to fall out when the door was opened, thereby injuring plaintiff. Plaintiff contends that the car started out safely loaded and rough handling in transit left an unsprung trap awaiting only the opening of the door by an employee of the consignee to set it off and cause the injury to the plaintiff. The case, however, was tried by plaintiff in the court below on the theory that the car was improperly loaded and that there was a failure to inspect on the part of the transporting carriers which constituted a violation of a duty which they owed and therefore negligence causing plaintiff's injury. It was on this basis that the trial court denied defendants' motion for a directed verdict at the trial, following plaintiff's opening statement to the jury, and permitted the plaintiff to proceed with the testimony. The case was tried on the theory that the car was negligently loaded. On this theory, the trial court at the end of the testimony directed a verdict for the defendants. Plaintiff cannot very well now proceed on the theory that the car was properly loaded. The plaintiff cannot thus shift his position on appeal. Gandrud v. Hansen, 215 Minn. 474, 10 N. W. (2d) 372; Olson v. Shephard, 165 Minn. 433, 206 N. W. 711.

■ It is apparent at the outset that this case involves the question of the liability of a railroad company which transports but does not load or unload a carload shipment, the claim of negligence being made by an employee of the consignee who was injured when a part of the lading in the car fell on him as he, with fellow employees, was unloading the car. Here, the empty car was ordered by the Soundview Pulp Company and by it as shipper requested switched to a loading platform (see, 11 Remington's Rev. Stat. of Washington, § 10347) on its premises. The testimony indicates that the latter company loaded and shipped approximately 250 cars per month at or

about the time this car was moved, all similarly loaded and placed.

The uniform bill of lading issued by the defendant Great Northern Railway Company, the initiating carrier of this car which was loaded, closed, and sealed by the Soundview Pulp Company, bore the notations "S. L. & C.," meaning "Shipper's Load and Count." The statute applicable provides that, if the car is loaded by the shipper, "the carrier shall not be liable for damages caused by the improper loading." 39 Stat. 541, 542, 49 USCA, § 101.

In Pennsylvania R. Co. v. Kittanning Co. 253 U. S. 319, 323, 40 S. Ct. 532, 533, 64 L. ed. 928, 930, the supreme court said:

"* * * The duty of loading and of unloading carload shipments rests upon the shipper or consignee."

The court below followed the reasoning advanced by Mr. Justice Cardozo in Lewis v. New York, O. & W. Ry. Co. 210 N. Y. 429, 104 N. E. 944, in directing verdicts in favor of defendants. In that case plaintiff was employed in a hay and coal yard. A carload of hay carried over defendant's railroad was switched on a side track to be unloaded by the consignee. The plaintiff with one other man undertook the unloading of it. While plaintiff was in the act of forcing open the car door with a crowbar some bales of hay, which had been piled end upon end close to the door, struck him and caused the injuries for which he brought suit. There was evidence in that case that the customary method of loading was to lay the bales flat in space near the car door; that piled endwise they were less secure; and that when the protection of the door was released nothing was left in place to stay their fall. The court pointed out in that case that the loading of the car was done by the shipper, not the defendant railway company, and that all the defendant railway company did was to seal the car after the shipper had placed the hay therein and closed the door. (In the instant case the shipper both closed and sealed the door.) The defendant railway company there neither packed nor observed how the shipper packed the hay. The court held that to charge the carrier with liability the court must be prepared to hold that after the car had been loaded and closed by the consignor the defendant carrier was under a duty

to inspect the contents in order to protect the consignee. The court then said (210 N. Y. 431, 104 N. E. 945) "We think that in the circumstances of this case such a duty did not exist," and laid down the following rule:

"* * * If the consignee undertakes to unload the car, which is switched for convenience on a side track in his yard, the carrier's function ends, and delivery is complete when the car is thus placed in the custody of the consignee. * * * It was through the consignor that the contract of carriage had been made, and the consignee in accepting the shipment adopted the contract thus made in his behalf."

It seems to us that where, as in the case before us, the contract of the defendant carriers was confined to the transportation of the boxcar to be fully loaded by the consignor at one end of the route and unloaded by the consignee at the other, both consignor and consignee must so have understood it. It has not been and it is not now the law that, under the circumstances, the transporting carriers were under a duty to the consignee to establish a system of inspection to guard against the consequences of careless loading by the shipper, at least where carrying the common products of the farm and factory in carload lots is involved. As was said in the Lewis case, to hold that the carrier impliedly undertakes to inspect for the consignee's protection all cars that come into its custody, no matter where loaded or by whom, would be to impose an unjust burden. It often happens that the shippers furnish their own cars for the shipping of their product. Where the situation is such that it is plain to everyone concerned that the carrier is to take no part in loading or unloading, its duty is fulfilled when it transports the freight in safety. The car which the plaintiff had commenced to unload at the time he was injured was not in the control of either transporting carrier at the time of unloading nor on their premises, but on the premises of the consignee, moved by its power on its tracks, and unloaded by its employees. Neither of the tranporting carriers here owed the duty of breaking the seal on the car and entering to make an inspection of the cargo or dunnage material and the manner of

its loading where there was nothing visible on reasonable inspection from the outside to indicate a defect, such as a bulging door, broken appliance, or the like.

This court in considering the respective duties of carrier and shipper in Northwestern Marble & Tile Co. v. Williams, 128 Minn. 514, 518, 151 N. W. 419, 421, L. R. A. 1915D, 1077, said:

"It cannot be said, however, that the carrier must, at his peril, know that the goods are not in fact safely packed. The shipper usually knows better than the carrier the manner in which the goods have been packed and the manner in which they should be packed, and even though the carrier may have knowledge of some defect in the packing, still, if it is not apparent to the ordinary observation of the carrier or his servants that the goods cannot be safely carried in the condition in which they are presented, the carrier should not be held to take the chances of injury from improper packing."

See, also, State v. Sprague, 201 Minn. 415, 276 N. W. 744; 13 C. J. S., Carriers, § 67.[3]

Numerous cases have been cited by plaintiff in support of his claim of negligence on the part of the defendant carriers, but all

[3]Other cases supporting the position of respondents on facts in many respects similar are Copeland v. Chicago, B. & Q. R. Co. (8 Cir.) 293 F. 12; Butler v. Central of Georgia Ry. Co. 87 Ga. App. 492, 74 S. E. (2d) 395; Wintersteen v. National Cooperage & Woodenware Co. 361 Ill. 95, 197 N. E. 578; Novello v. Trustees of New York, N. H. & H. R. Co. 324 Mass. 276, 85 N. E. (2d) 765; Pitman v. Yazoo & M. V. R. Co. 171 Miss. 799, 158 So. 547; Connors v. Tanners Products Co. 110 N. J. Law 479, 166 A. 154; Chicago, R. I. & P. Ry. Co. v. McCulley, 30 Okl. 178, 120 P. 279; Gulf, W. T. & P. Ry. Co. v. Wittnebert, 101 Tex. 368, 108 S. W. 150, 14 L.R.A.(N.S.) 1227; Washington v. Texas & Ft. S. Ry. Co. 22 Tex. Civ. App. 189, 54 S. W. 1092. (The following cases concern the ultimate or delivering carrier: Martin v. Southern Pac. Co. [N. D. Calif.] 46 F. Supp. 954; Ambrose v. Western Maryland Ry. Co. 368 Pa. 1, 81 A. [2d] 895; White v. New York, N. H. & H. R. Co. 25 R. I. 19, 54 A. 586; Pass v. Gulf, C. & S. F. Ry. Co. [Tex. Civ. App.] 83 S. W. [2d] 729; Kansas City, M. & O. Ry. Co. v. Pysher [Tex. Civ. App.] 195 S. W. 981.)

are distinguishable upon the facts and it would serve no purpose to undertake any extended analysis.

■ Plaintiff in arguing for his right to have the order directing a verdict in favor of defendants set aside and a new trial granted does so in the alternative. He says that either there was an improper loading by the shipper and defendant carriers are liable for delivering an improperly loaded car; or the car was properly loaded but due to violent and rough handling, negligence follows as a matter of course, placing liability on the defendants as the connecting transporting carriers. There is no evidence in the record constituting proof of violent or rough handling or anything giving rise to or invoking the duty of inspection. Negligence is never presumed. Negligence must be proved and the plaintiff must sustain the burden of proof. He contends for the application of the doctrine of *res ipsa loquitur* under the circumstances disclosed by the evidence in order that he might have the benefit of the inference of negligence, which might, but which need not necessarily, operate in his favor but nevertheless would take his case to the jury on the facts. But in order to do this, plaintiff must show that the claimed negligence was caused by an agency or instrumentality under the *exclusive control* of the defendant connecting carriers, and this he has not done. He must also show that the accident was of a kind which does not ordinarily occur in the absence of someone's negligence and that the accident was not due to any voluntary action or contribution on the part of the plaintiff. It is also the rule that "The doctrine of res ipsa loquitur is never applicable where the circumstances of the accident do not identify the wrongdoer." Cruse v. Sabine Transp. Co. (5 Cir.) 88 F. (2d) 298, 300. The boxcar in question was not in the possession and control of either defendant nor upon the premises of either defendant when loaded or unloaded.[4]

---

[4]Barnes v. Northwest Airlines, Inc. 233 Minn. 410, 47 N. W. (2d) 180; State v. Sprague, *supra;* Mathews v. Chicago & N. W. Ry. Co. 162 Minn. 313, 202 N. W. 896; Sullivan v. Minneapolis St. Ry. Co. 161 Minn. 45, 200 N. W. 922; Kleinman v. Banner Laundry Co. 150 Minn. 515, 186 N. W. 123, 23 A. L. R. 479; Martin v. Southern Pac. Co. *supra;* 65 C. J. S., Negligence, § 220 (8) bb.

Under the state of the record the jury could not have drawn any reasonable inference of negligence as to any act of the defendants in transporting the car. The question of negligence would have been left entirely to the field of conjecture and speculation. Several cases were cited by the plaintiff involving the shipment of goods by freight where the carrier loads or unloads or inspects beforehand and supervises; where the carrier is universally held an insurer under a rule founded in public policy and not on negligence; and where only the accepted common-law defenses such as damage due to an act of God, default of the shipper, inherent vice, riots, strikes, and a public enemy are available to the carrier. These are by no means controlling here since the case at bar is founded in tort and based only on negligence. Northwestern Marble & Tile Co. v. Williams, *supra;* Levine v. Duluth & I. R. R. Co. 171 Minn. 205, 214 N. W. 17; Stokes v. Burlington-Rock Island R. Co. (Tex. Civ. App.) 165 S. W. (2d) 229, 232. As was said in the latter case cited above: "Manifestly, none of the defendants was an insurer of the safety of workmen who might be engaged by the consignee to unload the poles." Neither the consignor nor the consignee was made a defendant in this lawsuit. Whether others aside from the defendant carriers were negligent we do not determine here. What we have said about the absence of proof by claimant of negligence by the defendants and the inapplicability of the doctrine of *res ipsa loquitur* disposes of the claim for damages on account of plaintiff's injury. The facts and the circumstances are not such as to warrant an inference of negligence of defendant carriers which caused the injury to the plaintiff.

Our conclusions on these issues make it unnecessary to consider any other assignments of error urged by the plaintiff. We find none of the cases cited by plaintiff decisive on these facts either as to the claim of negligence or the applicability of the doctrine of *res ipsa loquitur.*

We must conclude that the evidence in this case was insufficient as a matter of law to raise any of the specific allegations of actionable negligence contended for by plaintiff and upon which a recovery

was sought and that the trial court properly directed the verdict of the jury.

The order appealed from is affirmed.

Affirmed.

Mr. Justice Christianson took no part in the consideration or decision of this case.