ELEANOR POTTER, Indiv. and as Adm'x of the Estate of Herbert Potter, Deceased, Plaintiff-Appellee, *v.* CHICAGO HEIGHTS MOTOR FREIGHT, INC., *et al.*, Defendants-Appellants.—(VULCAN TUBE AND METALS, Defendant.)

First District (Fifth Division) No. 78-1958

Opinion filed November 16, 1979.

Ruff and Grotefeld, Ltd., of Chicago (Jack L. Uretsky, of counsel), for appellants.

Frank J. Mackey, Jr., of Chicago (Sidney Z. Karasik, of counsel), for appellee.

Mr. JUSTICE MEJDA delivered the opinion of the court:

This is an interlocutory appeal pursuant to Supreme Court Rule 308. (Ill. Rev. Stat. 1977, ch. 110A, par. 308.) Following the denial of defendants' motion for summary judgment, the trial court certified three questions for this court's consideration. The basic background facts are undisputed for the most part.

Plaintiff's husband died on May 9, 1973, as a result of injuries suffered while unloading a shipment of steel tubing from a flat-bed truck owned by defendant, Chicago Heights Motor Freight (Freight). The decedent was then employed as a "crane hooker" by Maremont Corporation (Maremont). The steel tubing had been consigned to Maremont by Vulcan Tube and Metals (Vulcan) which had loaded the steel tubing onto the trailer. The tubing was loaded in bundles of 91 tubes each, 2½ inches x .045 inches in size and gauge. There were 27 bundles in all, each weighing about 1500 pounds. The bundles were 13 feet long and were loaded in three sections end-to-end on the 40-foot trailer. Each section consisted of nine bundles, stacked three across and three high. The stacks were about 8 feet high and about 8 feet wide, the width of the trailer. Two-by-fours were placed under the load and between each layer.

Freight received the shipment at its Chicago Heights terminal. Defendant Jackson,[1] a truck driver for Freight with 15 years experience, was assigned to deliver the trailer to Maremont. Chains had been placed over the load in compliance with union rules to insure safe transport. Before leaving, he inspected the load and found that "it looked good. It was tight." He then drove the loaded trailer to Maremont and gave the bills of lading to Maremont's receiving clerk. At his deposition, Jackson testified that he asked the clerk whether he wanted the entire load unchained at one time or each stack as they were unloaded. The clerk told him to "unchain the whole thing." After unchaining the load, Jackson

---

[1] Mr. Jackson has since died and notice spread of record.

went outside and began to read a paper. He testified that when he unchained the bundles they did not shift or move. He did not see the accident but returned immediately thereafter. He saw that 14 of the 27 bundles had been unloaded and that the steel strappings were intact.

Robert Richardson, a truck driver for another company, witnessed the accident. At his deposition he testified that he was waiting to unload his truck and "went in to find out what the hold-up was." He saw decedent standing on top of a lift of tubing on the truck. He stated that decedent apparently lost his balance and fell off the truck. Later in his deposition he stated that the bundle shifted and that is why decedent was trying to get away from it and lost his balance. One of the bundles fell off and hit decedent in the back. Based upon Richardson's nine years of experience as a truck driver, in his opinion the truck lacked adequate load-securing devices and was loaded in a manner dangerous to people unloading it.

Maremont refused to unload the rest of the steel and returned it to Vulcan for reshipment. Two days after the accident Maremont sent a letter to Vulcan directing Vulcan to load future shipments of tubing on trailers "with four feet high sides" and to "load the bundles only two high."

Plaintiff, individually and as administratrix of decedent's estate, brought this wrongful death action against Freight, Vulcan and Jackson for damages caused by their alleged negligence in loading, operating and delivering the trailer and freight.

As to Freight and Jackson, the complaint alleged in relevant part that they "were guilty of one or more of the following careless and negligent acts or omissions:

"(a) * * *

(b) Failed to provide side rails on the said trailer;

(c) Carried and delivered bundles of steel tubing that was loaded in an unstable manner;

(d) * * *

(e) Failed to provide safe and adequate service, equipment and facilities for the transportation of the said steel tubing, in violation of Chapter 95½, Section 18—310, Illinois Revised Statutes;

(f) Drove or moved said trailer even though it was not constructed or loaded so as to prevent its load from dropping or shifting, in violation of Chapter 95½, Section 15—109, Illinois Revised Statutes;

(g) * * *."

Subparagraphs (a), (d) and (g) were stricken by the trial court and are not involved on appeal.

Freight and Jackson denied the allegations and Freight counterclaimed against Vulcan and also filed a third-party action against

Maremont. Maremont's motion to dismiss the third-party complaint is still pending in the trial court. Freight and Jackson filed a motion for summary judgment, contending that they had breached no duty owed to decedent. The motion was denied as well as Freight's motion for a rehearing. The trial court then certified the following questions for appeal:

"1. Whether a motor carrier, transporting a shipment of steel tubing on a flat-bed trailer, whose driver participated in the loading and unloading process only by chaining the loading at the point of departure and removing the chains upon arrival at destination, has the duty to:

(a) Make a reasonable inspection of the transporting vehicle and the freight to determine whether it is reasonably safe to unload the cargo; and

(b) Either repair or warn consignee of any conditions, except obvious defects in the freight and the transporting vehicle, which make it unsafe to unload the cargo?

2. Whether Ill. Rev. Stat. 1973, ch. 95½, sec. 18—310, which in pertinent part provides that:

'It shall be the duty of every common carrier of property by motor vehicle to provide safe and adequate equipment, and facilities * * * and observe * * * just and reasonable regulations and practices relating * * * to the manner and method of presenting, marking, packing and delivering property for transportation, the facilities for transportation *and all other matters relating to or connected with the transportation of property in interstate[2] commerce.*'

imposes a duty on a motor carrier transporting a shipment of steel tubing on a flat-bed trailer, to provide safe and adequate facilities and to observe just and reasonable practices relating to the manner and method of presenting and delivering cargo for unloading?

3. Whether Title 49, USC CFR, Sec. 392.9 imposes a duty on a motor carrier transporting a shipment of steel tubing on a flat-bed trailer to secure adequate means of fastening the vehicle's cargo and to periodically examine and adjust the cargo and the cargo securing devices in order to maintain the security of the load?" (Emphasis added.)

Opinion

I

The first certified question deals with the duty of a carrier to employees of a consignee of goods to inspect a vehicle *and* its freight, and

---

[2] The certified question incorrectly used the word "interstate" contrary to the statutory language which reads "intrastate."

to warn of latent defects in either of them. Plaintiff contends that a carrier has a duty to inspect the freight as well as the vehicle, while defendants assert that the duty extends only to an inspection of the vehicle. Both parties rely on *Conway v. Belt Ry. Co.* (1968), 41 Ill. 2d 45, 241 N.E.2d 434, as stating the applicable law. *Conway* involved injuries suffered by an employee of a consignee while unloading wooden beams from a gondola railroad car. The court made it clear that the defective lading condition was obvious to all parties concerned and limited the case by stating:

> "* * * We are concerned not with failure to inspect or with unknown defects in the car, but with obvious defects in the load itself, and the responsibility of the delivering carrier for the negligent unloading operations by a third party." (41 Ill. 2d 45, 50-51.)

Because of the obvious nature of the defective lading and the fact that plaintiff had notice of the defect, the court found that the carrier had not breached any duty to warn plaintiff. *Conway* makes it clear that the carrier has no duty to warn a consignee's employee of obvious or patent defects.

The instant case does not involve a patent defect in the lading but one which, if it existed at all, was not readily observed by either party. Concerning these latent defects, the supreme court stated the general rule as follows:

> "The rule in other jurisdictions, as in Illinois, is that the carrier delivering a railroad car received from a connecting carrier owes the consignee and its employee engaged in unloading the car the duty of making a reasonable inspection of such car to determine whether it is reasonably safe for its foreseeable uses, and the duty to either repair or warn the consignee of any conditions which render the car unsafe for unloading. (*Rylander v. Chicago Short Line Railway Co.*, 17 Ill. 2d 618, 621; *Kansas City Railway Co. v. Guillory* (Texas, 1964), 376 S.W.2d 72, 75; *Illinois Central Railroad Co. v. Crawford* (Miss., 1962), 143 So.[2d] 427, 429; *Pellegrini v. Chicago Great Western Railway* (7th Cir., 1964), 319 F.2d 447.) Such duty, however, extends only to hidden defects. The delivering carrier is not liable to one who had notice or warning of the defect. [Citations.]" 41 Ill. 2d 45, 51.

In this statement the duty is limited to inspection of the car, but the opinion suggests that a duty to inspect for latent defects in the lading may be included.

Defendant relies on *Lewis v. New York, Ontario & Western Ry. Co.* (1914), 210 N.Y. 429, 104 N.E. 944, as establishing that the carrier has no duty to inspect the lading for latent defects. That case involved a sealed

boxcar which had been loaded by the shipper. The carrier did not observe the loading and merely sealed the car after loading. An employee of the consignee was hit by a bale of hay when the door was opened and suffered injuries. Regarding the carrier's duty to inspect the lading, Justice Cardozo expressed the court's view as follows:

> "In these circumstances, we think that the defendant was under no duty toward the consignee to establish a system of inspection in order to guard against the consequences of careless loading by the shipper. * * * To hold that a carrier impliedly undertakes to inspect for the consignee's protection all cars that come into its custody, no matter where loaded or by whom, would be to impose an unjust burden." 210 N.Y. 429, 432-33, 104 N.E. 944, 945.

This position was accepted in *Shipley v. Southern Pacific Co.* (1963), 44 Ill. App. 2d 1, 193 N.E.2d 862, where the court found that the carrier had no absolute duty to employees of a consignee to see that the load was safe for unloading.

Although *Lewis* and *Shipley* clearly found no duty to inspect the condition of the load to determine whether it was safe for unloading, the fact that sealed boxcars were involved in both cases would distinguish them from this case. Because the cars had been sealed, the carriers would be incapable of inspecting the cargo upon delivery and the imposition of such a duty would be unreasonable. While the appellate court opinion in *Conway v. Belt Ry. Co.* (1967), 88 Ill. App. 2d 134, 232 N.E.2d 283, suggested that this distinction should not vary the carrier's responsibility, resolution of that question was unnecessary to a determination of the issues there presented. In the instant case, the open nature of the truck bed would facilitate an inspection of the cargo. Therefore, the imposition of such a duty would not be unduly burdensome or unreasonable.

A case which is very similar to *Conway* and was cited by the supreme court is *Illinois Central R.R. Co. v. Crawford* (1962), 244 Miss. 300, 143 So.2d 427. The facts are reported in *Illinois Central R.R. Co. v. Crawford* (1962), 244 Miss. 300, 140 So.2d 90. Plaintiff was injured while unloading poles, 70 to 75 feet long, from a flatcar. It was established that the poles were not "nesting" properly on the car in question and that this condition was apparent to the consignee's employees. The Mississippi Supreme Court found no liability on the part of the carrier because of the patent nature of the defect in the lading and the awareness of the plaintiff of the condition. The court discussed generally the duty of the carrier and set out several general rules:

(1) A shipper who negligently loads a flatcar is liable in damages to the employees of the unloading consignee for injuries proximately resulting from the shipper's negligent loading of the car.

(2) The delivering carrier owes to the consignee and to his employees

a duty to make a reasonable inspection of the car to determine whether it is safe for unloading, and to give the consignee notice of defective conditions in the car which are discoverable by such an inspection.

(3) The duty of a carrier in these cases is like that of a landowner to an invitee. The landowner is liable for damages by defects or an unsafe condition, unless the owner gives adequate notice of the latent and concealed perils which are known, or should be known, to the owner but unknown to the invitee.

Regarding this last duty, the court did not limit the inspection to the car itself but included the freight by saying:

"In the next place, assuming arguendo that the 'nesting of the poles' was disturbed by the adjustment made by the carrier, but the load could nevertheless be safely transported to its destination, the Railroad Company was not required to unload the poles for the consignee, it was only required to notify the consignee of any danger in the shipment of freight and equipment known to the carrier, to the end that the consignee might be warned of the danger." 244 Miss. 300, 314, 143 So.2d 427, 430-31.

■■ We conclude that *Crawford* sets forth the applicable duty in this case. In answer to the first certified question, we hold that a motor carrier transporting steel on a flat-bed trailer owes a duty to a consignee and his employees who must unload the trailer to make a safe delivery of the trailer. This duty includes: (1) making a reasonable inspection of the transporting vehicle and its freight for latent defects to determine whether it is reasonably safe to unload; and (2) to warn of latent defects or dangerous conditions in the freight and transporting vehicle of which the carrier has knowledge or which a reasonable inspection would have revealed and which are unknown to the consignee.

## II

The second certified question addresses the applicability of section 18—310 of the Illinois motor carrier of property law (Ill. Rev. Stat. 1977, ch. 95½, par. 18—310) contained in the Illinois Vehicle Code (Ill. Rev. Stat. 1977, ch. 95½, par. 1—100 *et seq.*) to the instant facts.

Initially, appellants urge that this court consider the applicability of section 15—109 of the Illinois Vehicle Code (Ill. Rev. Stat. 1977, ch. 95½, par. 15—109), together with section 18—310 which was included in the certified question. They argue that the omission of section 15—109 was inadvertent since both sections were argued before the trial court but only section 18—310 was included in the certified question. They contend that the inclusion of that section on appeal would expedite the termination of the lawsuit, as well as effectuate the intention of the trial judge and should

be addressed pursuant to Supreme Court Rule 366. Ill. Rev. Stat. 1977, ch. 110A, par. 366.

■■ The appeal should be limited to the question as certified by the trial court. Review by the appellate court is limited to final orders and certain interlocutory orders specified by the Supreme Court Rules. (*Myers v. Myers* (1977), 51 Ill. App. 3d 830, 366 N.E.2d 1114; *Browning v. Heritage Insurance Co.* (1974), 20 Ill. App. 3d 622, 314 N.E.2d 1.) It is a matter of jurisdiction, and this court should not expand on questions properly before the court to answer others which could have been included. It is more likely that the trial court felt that section 15—109 did not apply to the facts and therefore did not include it. Both sections were included in defendant Freight's proposed question and the omission of one in the final question should not be considered inadvertent. However, we note that section 15—109 by its own terms does not apply to this case. That section provides in pertinent part:

> "No vehicle shall be driven or moved on any highway unless such vehicle is so constructed or loaded as to prevent any of its load from dropping, shifting, leaking or otherwise escaping therefrom, * * *." (Ill. Rev. Stat. 1977, ch. 95½, par. 15—109(a).)

"Highway" is defined as:

> "The entire width between boundary lines of every way or place of whatever nature when any part thereof is open to the use of the public as a matter of right for purposes of vehicular traffic, other than public ways for vehicular traffic, within a park district for which the park district has maintenance responsibility, excepting the Chicago Park District." Ill. Rev. Stat. 1977, ch. 95½, par. 15—100.

By its very terms section 15—109 does not apply to this case. It makes spilling on public ways illegal but not spilling on private property as occurred in this case. Plaintiff has not alleged that any shifting or spilling occurred on the highway during transit. Therefore, we find no violation of section 15—109 which would raise an inference of negligence on the defendants' part.

■■ Even if a violation of section 15—109 could be established, the decedent was not within the class of persons intended to be protected by that law. Subsection (b) of that section limits the class protected to "other users of the highway." Since plaintiff has failed to establish that decedent was within this class, even if a breach of the statute could be shown, that fact could not be used to establish defendants' negligence as to this plaintiff. See *French v. City of Springfield* (1976), 65 Ill. 2d 74, 357 N.E.2d 438; *Davis v. Marathon Oil Co.* (1976), 64 Ill. 2d 380, 356 N.E.2d 93.

The second question as certified concerns the applicability of section 18—310 of the Illinois motor carrier of property law (Ill. Rev. Stat. 1977, ch. 95½, par. 18—310) to this case. That section provides:

"It shall be the duty of every common carrier of property by motor vehicle, to provide *safe and adequate service, equipment, and facilities* for the transportation of property in intrastate commerce and, except as specifically exempted in Section 18—311 to establish and observe just and reasonable rates, charges, and classifications, and just and reasonable regulations and practices relating thereto *and to the manner and method of presenting, marking, packing, and delivering property for transportation, the facilities for transportation, and all other matters relating to or connected with the transportation of property in intrastate commerce.*" (Emphasis added.) Ill. Rev. Stat. 1977, ch. 95½, par. 18—310.

The controversy appears to be whether the duty detailed above extends to the unloading of cargo. Defendants argue that the purpose of the Illinois motor carrier of property law (Ill. Rev. Stat. 1977, ch. 95½, pars. 18—100 through 18—903) as set forth in section 18—101 of that act does not encompass safety in loading and unloading cargo but is limited to control of transportation "over the public highways of this State." (See also Ill. Rev. Stat. 1977, ch. 95½, pars. 18—301(b) and 18—302(b).) Plaintiff contends that "transportation" includes the loading and unloading of freight and that the deceased was within the class of persons protected by the statute.

No adequate definition of transportation is included in the Illinois motor carrier of property law since the definition found in section 18—100(12) of that Act (Ill. Rev. Stat. 1977, ch. 95½, par. 18—100(12)) does not address the precise issue involved here. Section 10—8 of the Public Utilities Act (Ill. Rev. Stat. 1977, ch. 111 2/3, par. 10.8) defines "Transportation of property" as follows:

" 'Transportation of property' includes any service in connection with the receipt, carriage, delivery, elevation, transfer in transit, ventilation, refrigeration, icing, storage and handling of the property transported."

We feel that this definition is equally applicable to the word "transportation" found in section 18—310. The Illinois Commerce Commission was created by the Public Utilities Act (Ill. Rev. Stat. 1977, ch. 111 2/3, par. 1) and has the power and authority to enforce the provisions of the Illinois motor carrier of property law. (Ill. Rev. Stat. 1977, ch. 95½, par. 18—101.) The definitions found in the Public Utilities Act bind the Commission in matters which it regulates. Since the definition of "transportation of property" found in the Public Utilities Act

would bind the Commission in enforcing the provisions of section 18—310, it is appropriate that we apply the same definition.

■■ Additionally, both acts deal with the regulation of carriers and are *in pari materia*. As such, they should be construed together to determine the intent of the legislature. (*City of Highland Park v. Curtis* (1967), 83 Ill. App. 2d 218, 226 N.E.2d 870; *Cody v. Ladurini* (1969), 109 Ill. App. 2d 116, 249 N.E.2d 315.) It would be inconsistent and unreasonable to apply different definitions to the same word in two statutes dealing with the same subject.

Applying the definition found in the Public Utilities Act it is clear that the duty imposed by section 18—310 extends beyond the time the freight is in transit on the highway. This conclusion is supported by the terms of section 18—310 which include activities in preparation for the movement and "all other matters relating to or connected with the transportation of property * * *."

■■ Accordingly, we find that section 18—310 imposes a duty on a motor carrier transporting a shipment of steel tubing on a flat-bed trailer to provide safe and adequate facilities and to observe just and reasonable practices relating to the manner and method of presenting and delivering cargo for unloading.

### III

The third certified question concerns the applicability of certain regulations of the Interstate Commerce Commission (49 C.F.R. §392.9) to the instant case. Those regulations prohibit a person from driving a motor vehicle unless certain safeguards are satisfied. Because we find that the regulations are inapplicable and imposed no duty on defendants, it is unnecessary to set them out in detail.

49 C.F.R. §392.9 was promulgated pursuant to the rule-making powers of the Interstate Commerce Commission. (49 U.S.C. §304 (1976); see 49 C.F.R. §386.1 (1976).) The law as in effect at the time of the accident[3] limited the application of the rule-making powers to "* * * the transportation of passengers or property engaged in interstate or foreign commerce * * *." (49 U.S.C. §302(a) (1976).) "Interstate commerce" is defined in pertinent part as "commerce between any place in a State and any place in another State * * *." (49 U.S.C. §303(a)(10) (1976).) Plaintiff has not alleged any facts to show that the steel shipment was in interstate

---

[3] 49 U.S.C. §302(a) was repealed by Act of October 17, 1978, Pub. L. No. 95-473, 92 Stat. 1466. Section 4 of that act provided that the repeal of a law by the new act was not to be construed as a legislative inference that the provision was not in effect before its repeal and that the repeal of the laws did not affect rights and duties that matured before. We therefore consider the applicability of 49 C.F.R. §392.9 under the law as it was at the time of the accident.

686

commerce nor do any facts before us indicate this. We therefore conclude that 49 C.F.R. §392.9 is inapplicable to this case and imposed no duty on Freight or Jackson. (See *Earle v. Brink's, Inc.* (S.D.N.Y. 1943), 54 F. Supp. 676.) Because of this, we need not determine what duties the regulations may impose in the proper case.

For the foregoing reasons, we affirm the order of the circuit court denying defendants' motion for summary judgment and remand the cause for further proceedings not inconsistent with this opinion.

Affirmed and remanded.

LORENZ and WILSON, JJ., concur.